**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| LINDA PARKS, TRUSTEE, <u>ex rel.</u> ) | |
| TANYA LAMASTUS, ) | |
| ) | |
|              Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No. 05-1309-MLB |
| ) | |
| BETHANY HOME ASSOCIATION OF ) | |
| LINDSBORG, KANSAS, ) | |
| ) | |
|              Defendant. ) | |

<u>**MEMORANDUM AND ORDER**</u>

Before the court is defendant's motion for summary judgment (Doc. 38).  The motion has been fully briefed and is ripe for decision. (Docs. 39, 40, 41.)[1]  Defendant's motion is GRANTED for the reasons stated herein.

This case arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et seq.</u>  Plaintiff Tanya LaMastus[2] alleges defendant Bethany Home Association of Lindsborg, Kansas (Bethany Home) discharged her from her employment in violation of 42 U.S.C. § 12112. Section 12112(a) prohibits discrimination "against a qualified individual with a disability" with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

---

[1]  The court complements the parties' counsel on their well-written submissions.

[2]  LaMastus filed for bankruptcy on April 8, 2005.  On May 18, 2006, the court granted LaMastus' motion to add the Chapter 7 bankruptcy trustee, Linda Parks, as a named plaintiff.  (Doc. 32.)

## I.  FACTS

The following facts are uncontroverted.  Defendant owns and operates a nursing home in Lindsborg, Kansas.  LaMastus began working for defendant on December 9, 1994 as a Certified Nursing Assistant/ Certified Medication Assistant (CNA/CMA).  In June 2002, LaMastus was assigned as a CMA to a particular floor of Bethany Home.

Since 2001 defendant has maintained job descriptions for both CNAs and CMAs.  Highly summarized, CNAs provide direct supportive care for Bethany Home's residents; CMAs assist CNAs and also administer medications.   Both CNA and CMA position descriptions have detailed requirements regarding the physical demands of the positions.   CNAs are required to exert "medium" strength and must be able to exert "20-50 pounds of force occasionally, or 10-25 pounds of force frequently, or negligible - 20 pounds of force constantly to move objects."  CMAs are required to exert "heavy" strength and must be able to exert "50-100 pounds of force occasionally, or 25-50 pounds of force frequently, or 10-20 pounds of force constantly to move objects."

LaMastus has been diagnosed with thoracic scoliosis, a curvature of the spine, and chronic back pain.   In August 2003, LaMastus presented a work release form to defendant from Dr. Alan Wedel which included a lifting restriction due to her scoliosis.   For the next sixteen months, defendant accommodated her restriction by not requiring LaMastus to work the nursing floor and by permitting her to work as a CMA.   In this time period, LaMastus received disciplinary counseling from defendant on March 19, 2002, January 2, 2003, July 15, 2004, and September 29, 2004 for performance-related issues.   On September 30, 2004, LaMastus did not report to work and on the same

date her daughter presented defendant with a work release form from Dr. Graham Keats which stated LaMastus had no work limitations. On October 1, 2004, LaMastus was given a work release from Dr. Wedel which stated she "should avoid heavy lifting - may pass medications but should avoid working the floor due to difficulties associated with lifting." LaMastus gave this work release to Andrea Johnson, the human resource manager at Bethany Home. On October 13, 2004, LaMastus informed her supervisor that she could not push a nursing home resident in the resident's wheelchair because she, LaMastus, was short of breath. On October 14, 2004, LaMastus went to the emergency room because of a complaint of shortness of breath and on October 15, 2004 LaMastus presented defendant with a third work release form. The October 15 work release, from Dr. Steven Henson, indicated LaMastus had no work limitations.

At this point, Johnson reviewed LaMastus' three work releases and passed them on to Karen Carlson, the risk manager at Bethany Home. In light of the conflicting restrictions from LaMastus' doctors - and Dr. Wedel's failure to define the term "heavy lifting" in his release - Carlson sent Dr. Wedel a letter dated October 15, 2004, seeking clarification of the lifting restriction he placed on LaMastus. Carlson also forwarded to Dr. Wedel the CNA and CMA job descriptions for his review.

Also on October 15, 2004, LaMastus requested leave under defendant's Family and Medical Leave Act (FMLA) policy, for reasons unrelated to her scoliosis. The leave was granted, retroactive to October 1, 2004. On October 21, 2004, she learned during an appointment with Dr. Wedel that Dr. Wedel had been sent a letter from

-3-

defendant seeking clarification of LaMastus' lifting restriction.  At this appointment Dr. Wedel recommended to LaMastus that she should undergo a functional capacity evaluation.  Dr. Wedel admitted at his deposition that the phrase "heavy lifting" used in his work release was subjective and that LaMastus would need to undergo functional capacity testing to objectively determine how much weight she could safely lift.

On December 1, 2004, LaMastus received a release from Dr. Wedel to return to work "with previous restrictions on lifting."  Dr. Wedel's release also stated: "Suggest functional capacity testing if more specific lifting limitation necessary."  On or about December 8, 2004, LaMastus met with Johnson and gave her the December 1, 2004 note from Dr. Wedel.  Johnson informed LaMastus that her physician still had not provided clarification on her work restrictions and told her that she could not return to work until she provided more specific information about the extent of her lifting restriction.  LaMastus was also told she could continue on her FMLA leave while she sought clarification.

A short time later, on December 19, 2004, LaMastus applied for unemployment compensation benefits.  On January 4, 2005, defendant sent LaMastus a letter reminding her that she was still employed by defendant and asking her to contact defendant if she wanted to continue her employment.  LaMastus spoke with Johnson shortly thereafter and informed Johnson she wanted to remain employed by defendant.  Johnson reminded LaMastus that clarification was still needed about the extent of the restriction imposed by her physician.

On January 10, 2005, Johnson sent LaMastus a letter summarizing

-4-

their conversation and asking LaMastus to have her doctor describe the "specific restrictions" imposed as a result of her medical condition. LaMastus and Johnson spoke an additional time regarding her employment and Johnson sent LaMastus an additional letter further confirming defendant's need for clarification of her lifting restrictions.

Defendant's purpose in seeking clarification of Dr. Wedel's restriction was to determine whether LaMastus could safely perform her job with or without a reasonable accommodation. Dr. Wedel, in turn, felt a functional capacity examination was necessary to fairly determine her lifting restriction. LaMastus never underwent the evaluation because she could not pay for it and her health insurance would not pay for the evaluation because it was not medically necessary. Defendant never asked for or required her to undergo a functional capacity evaluation.

On March 4, 2005, defendant sent LaMastus a letter indicating her employment was being terminated because her FMLA leave had expired and because she had not provided any information clarifying her lifting restriction. The letter informed LaMastus that she should provide defendant with any information that would help defendant reconsider its decision but she never thereafter communicated with defendant regarding her lifting restriction.

More than three months later, on June 21, 2005, LaMastus received a release to return to work from Dr. Wedel that stated: "May return to work June 27, 2005. Recommend no resident lifting. No other restrictions." LaMastus never provided defendant a copy of this work release. Subsequently, Dr. Wedel has testified that his intention with LaMastus' work restrictions was to preclude her from lifting

-5-

residents of the nursing home.

Defendant has accommodated other employees' lifting restrictions. In these other circumstances, the employees' doctors provided defendant with specific information about how much weight the employees can and cannot safely lift so that defendant could make a determination about whether the employees could safely perform the essential functions of their jobs with or without reasonable accommodation.

With her medical condition, LaMastus believes she remains physically able to work in such positions as a CMA or a retail clerk. She remains able to perform her hobbies of sewing, crocheting, and decorating woodwork.  She can cook and care for herself without assistance when bathing and grooming and is able to perform household chores such as folding laundry, cleaning her house, and taking out trash.  LaMastus does, however, require help to tie her shoes and cannot vacuum, make beds, or lift heavy laundry.  LaMastus admits she is able to perform the tasks central to her daily living the majority of the time.

## II.  MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc.,

-6-

144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

Defendant moves for summary judgment alleging LaMastus cannot make a prima facie showing of wrongful discharge under the ADA because: 1) she does not have a "disability" as defined by the ADA; 2) defendant cannot be faulted for failing to provide a "reasonable accommodation" because LaMastus failed to clarify her restrictions; and 3) defendant terminated her for legitimate, non-discriminatory reasons.  LaMastus responds that she can make a prima facie showing of wrongful termination under the ADA because 1) she is a disabled person within the meaning of the ADA; 2) she was able to perform the essential functions of her job with reasonable accommodation at the time of her termination; and 3) she was terminated by defendant because of her disability.  Not all the parties' contentions need be addressed as LaMastus' failure on any one of the prima facie elements is dispositive.

## III.  ANALYSIS

A claim for wrongful discharge under section 12112 of the ADA requires a plaintiff to establish: 1) she is a disabled person within the meaning of the ADA; 2) she is able to perform the essential

functions of her job with or without reasonable accommodation; and 3) her employer terminated her because of her disability.[3]  <u>MacKenzie v. City and County of Denver</u>, 414 F.3d 1266, 1274 (10th Cir. 2005).  The "analytical framework" first pronounced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) applies to causes of action under the ADA. <u>MacKenzie</u>, 414 F.3d at 1274.  Because LaMastus presents no direct evidence of discrimination but instead relies on indirect evidence, she has the initial burden of establishing a prima facie case.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  If LaMastus does so, then defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action.  <u>Id.</u>  LaMastus then bears the ultimate burden of demonstrating that defendant's stated reason is in fact a pretext for unlawful discrimination and, therefore, unworthy of belief.  <u>See</u> <u>id.</u> at 804.  The court need not reach steps two and three of the <u>McDonnell Douglas</u> framework, however, because LaMastus fails to set forth sufficient evidence to establish a prima facie ADA claim.

The term "disability" is defined by section 12102(2) of the ADA as: 1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; 2) "a record of such an impairment"; or 3) "being regarded as having such an impairment."[4]  An analysis under the first category in the definition

---

[3]  Before a party can file a claim in federal court under the ADA, that party must first exhaust administrative remedies before the Equal Employment Opportunity Commission (EEOC). <u>MacKenzie v. City and County of Denver</u>, 414 F.3d 1266, 1274 (10th Cir. 2005).  The parties are not disputing the exhaustion of administrative remedies.

[4]  LaMastus expressly states that she is not claiming that defendant regarded her as being disabled.  (Doc. 90 at 16.)

of "disability" requires a three-step process. MacKenzie, 414 F.3d at 1275. First, the court must consider whether the plaintiff suffers from a physical impairment. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, the court must determine if the plaintiff's impairment substantially limits the major life activity. Whether the plaintiff has an impairment within the meaning of the ADA is a question of law. Whether the conduct affects a major life activity is also a legal question. "However, ascertaining whether the impairment substantially limits the major life activity is a factual question." Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

LaMastus specifically asserts that she suffers from a physical impairment, scoliosis, that substantially limits the major life activity of lifting. (Pretrial order, Doc. 37 at 4.) Defendant does not take a position whether scoliosis is a physical impairment. A jury could reasonably conclude that LaMastus suffers from a "physiological disorder, or condition . . . affecting one or more of the following body systems: . . . musculoskeletal." 29 C.F.R. § 1630.2(h)(1). She has met her burden under this first stage of the definition of disability.

The term "major life activity" is defined by EEOC regulations. It includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Lifting has been held to be a major life activity. See McCoy v. USF Dugan, Inc., 42 Fed. Appx. 295, 297 (10th Cir. 2002); Lusk v. Ryder Integrated Logistics, 238 F.3d 1237,

1239 (10th Cir. 2001); <u>Lowe v. Angelo's Italian Foods, Inc.</u>, 87 F.3d
1172, 1174 (10th Cir. 1996).  Thus, LaMastus has also met her burden
under the second stage of the definition of disability.

Therefore, the question that remains is whether LaMastus'
scoliosis "substantially limits" the major life activity of lifting.
The term "substantially limits" is also defined within EEOC
regulations.  To establish she is disabled, LaMastus must show that
she is "significantly restricted" in performing a major life activity
"as compared to the condition, manner, or duration under which the
average person in the general population can perform that same major
life activity."  29 C.F.R. § 1630.2(j)(1).  There are three factors
used to determine whether an impairment substantially limits a major
life activity: 1) the nature and severity of the impairment; 2) the
duration or expected duration of the impairment; and 3) the permanent
or long term impact resulting from the impairment.  <u>Id.</u> §
1630.2(j)(2).  The word "substantially" in the phrase "substantially
limited" means "considerable" or "to a large degree."  <u>Toyota Motor
Mfg., Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 196 (2002).  "The word
substantial thus clearly precludes impairments that interfere in only
a minor way with the performance of manual tasks from qualifying as
disabilities."  <u>Id.</u> at 197.

LaMastus attempts to meet her burden in this stage of the
definition of "disability" with the following response to defendant's
motion for summary judgment:

> Plaintiff's scoliosis substantially limits one or
> more of her major life activities in that she is
> unable to perform that which the average person
> in the general population can perform.  Further,
> plaintiff is significantly restricted as to the

-10-

> condition, manner, and/or duration under which
> she can perform such activities as compared to
> the average person.
>
> Plaintiff testified that she is not able to
> perform manual tasks at home such as vacuuming,
> laundry, cleaning that involves using a ladder,
> and making beds.  She has difficulty lifting.
> Plaintiff also testified that she cannot tie her
> own shoes and often wears slip-on shoes as a
> result.  She further explained that she is not
> able to bend down on her knees and get back up,
> which affects her ability to perform certain
> tasks.  Plaintiff's treating physician even
> issued continuing work restrictions limiting her
> ability to lift in the context of her work at
> Bethany Home.  Lifting is a major life activity.
> An average person in the general population is
> capable of performing all of the activities
> listed above.  Thus, since plaintiff's scoliosis
> substantially limits her in the ability to
> perform these activities, she is a disabled
> person within the meaning of the ADA.

LaMastus makes these essentially conclusory allegations that she
is substantially limited compared to the average person, but she has
no evidence that her inability to vacuum, tie her shoes, make the bed,
use a ladder, or bend down on her knees has anything to do with a
lifting restriction.  The most she has alleged is that her physician
restricted her from "heavy lifting" at work.  LaMastus admits she is
able to perform the tasks central to her daily living the majority of
the time.  See McWilliams v. Jefferson County, 463 F.3d 1113, 1116-17
(10th Cir. 2006)(holding that the plaintiff had "not produced evidence
that she was substantially impaired or significantly restricted in any
major life activity" because she did not show that she was "unable to
perform any of the life activities completely").

Furthermore, the Tenth Circuit has plainly required more than a
mere assertion of a lifting restriction to establish a disability.

-11-

To demonstrate that an impairment is substantially limiting, a plaintiff must show she is "unable to perform the activity or is significantly restricted in the ability to perform the major life activity compared to the general population." Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240 (10th Cir. 2001). When the impairment of the major life activity appears substantially limiting on its face, comparative evidence is not required as a matter of law to withstand a motion for summary judgment. Id.

In Lusk v. Ruder Integrated Logistics, the Tenth Circuit held that a permanent, forty-pound lifting restriction was not substantially limiting on its face. 238 F.3d 1237 (10th Cir. 2001). The court stated: "Evidence that a lifting impairment merely affects a major life activity is generally insufficient; rather, a plaintiff must produce comparative evidence from which a reasonable inference can be drawn that such activity is substantially limited." Because the plaintiff in Lusk did not describe any substantial limitations on his day-to-day activities, the long term impact of his restriction, or present any comparative evidence as to the general population's lifting capabilities, the court held the plaintiff had not met his summary judgment burden. See also Velarde v. Associated Reg'l and Univ. Pathologists, 61 Fed. Appx. 627, 629-30 (10th Cir. 2003)(holding that a twenty-five pound lifting restriction is not substantially limiting on its face and therefore granting summary judgment for defendant because the plaintiff presented no evidence comparing his lifting abilities to those of the general populace); Gibbs v. St. Anthony Hosp., No. 96-6063, 1997 WL 57156 (10th Cir. Feb. 12, 1997)(holding that evidence of a twenty-five pound repetitive lifting

-12-

restriction and a thirty-five pound occasional lifting restriction, without more, was insufficient to establish that the plaintiff was substantially limited in the major life activity of lifting); <u>Wells v. Wal-Mart Stores, Inc.</u>, 219 F. Supp. 2d 1197, 1206 (D. Kan. 2002)(holding that a plaintiff who failed to present evidence other than a seventy-five pound lifting restriction had not met his summary judgment burden); <u>cf.</u> <u>Lowe v. Angelo's Italian Foods, Inc.</u>, 87 F.3d 1170 (10th Cir. 1996)(holding that a plaintiff who presented evidence that she suffered from multiple sclerosis and that as a result she was restricted from lifting in excess of fifteen pounds and could lift items weighing less than fifteen pounds only occasionally had presented evidence of a lifting impairment that was substantially limiting on its face).

LaMastus has, at most, presented evidence that her physician restricted her from lifting the residents at Bethany Home.  This lifting restriction is far less specific than the lifting restrictions rejected in the cases cited above.  LaMastus has not gone forth with her burden of showing a substantial limitation on her day to day activities, the long-term impact of her restriction, or comparative evidence of the general population's lifting capabilities.  For these reasons, she has failed to make a prima facie case that she is "disabled" under the ADA.

LaMastus' claim for wrongful termination under the ADA fails for another reason because she has not shown that defendant refused to provide her with a reasonable accommodation.  "To facilitate the reasonable accommodation, the federal regulations implementing the ADA envision an interactive process that requires participation by both

-13-

parties." <u>Bartee v. Michelin North America</u>, 374 F.3d 906, 906 (10th Cir. 2004) (citation and quotation omitted).  The interactive process should begin with notice to the employer from the employee of "the disability and any resulting limitations." <u>Id.</u>  After giving such notice to the employer, both parties have an obligation to proceed in a "reasonably interactive manner" to determine the reasonable accommodation.

A request from defendant for information from LaMastus regarding the scope of her physician's directive to "avoid heavy lifting" was reasonable and necessary, especially in light of defendant having received two additional work release forms from different physicians within a matter of days that gave no lifting restrictions at all. LaMastus' failure to provide medical information necessary to the interactive process precludes her from claiming that defendant violated the ADA by failing to propose reasonable accommodation. <u>See Templeton v. Neodata Services, Inc.</u>, 162 F.3d 617, 619 (10th Cir. 1998)(finding an employer's request for "updated medical information" reasonable in light of conflicting reports and holding the employee who failed to provide the information could not then allege her employer failed to reasonably accommodate her disability).  The fact that defendant did not offer to pay for the functional capacity test suggested by Dr. Wedel is not evidence of failure to accommodate.

## IV. CONCLUSION

A plaintiff at all times bears the ultimate burden of persuading the trier of fact that she has been the victim of illegal discrimination based on a disability. <u>White v. York Intern. Corp.</u>, 45 F.3d 357, 361 (10th Cir. 1995).  LaMastus has failed to meet this

-14-

burden.   Not only has she not presented evidence showing she is "disabled" under the ADA, she has also failed to show defendant failed to reasonably accommodate her impairment. Defendant's motion for summary judgment is GRANTED.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.


IT IS SO ORDERED.

Dated this  15th  day of November 2006, at Wichita, Kansas.


S/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-15-